UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE AMERICAN TOWER CORPORATION SECURITIES LITIGATION | No. 06-CV-10933 (MLW) |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lynda J. Grant *(pro hac vice)*
David J. Goldsmith *(pro hac vice)*
LABATON SUCHAROW
   & RUDOFF LLP
100 Park Avenue
New York, New York  10017-5563
Tel: (212) 907-0700
Fax: (212) 818-0477

*Lead Counsel for Lead Plaintiff*
*Steamship Trade Association-International*
*Longshoremen's Association Pension Fund*

[Additional counsel listed on signature page]

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION .............................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................ 4

III.   THE PARTIES.................................................................................................. 4

IV.    SUBSTANTIVE ALLEGATIONS .................................................................. 9

       A.     How Stock Options Work.................................................................... 9

       B.     Backdating Options ........................................................................... 10

       C.     Defendants' Scheme ........................................................................... 12

       D.     AMT's Stock Option Plan ................................................................. 15

       E.     AMT's By-Laws.................................................................................. 16

       F.     AMT's Improper Pricing of Stock Option Grants ........................... 16

       G.     The Review and Findings of AMT's Special Committee................. 21

       H.     The Compensation Committee's Revised Option Grant Procedures.......... 24

       I.     AMT's Remediation Plan................................................................... 25

V.     AMT ADMITS THAT IT BACKDATED AND MANIPULATED
       STOCK OPTION GRANTS AND THAT ITS FINANCIAL
       STATEMENTS ARE FALSE ........................................................................ 26

VI.    DEFENDANTS WERE CONSCIOUSLY AWARE OF, OR
       DISREGARDED WITH A HIGH DEGREE OF RECKLESSNESS,
       AMT'S IMPROPER ACCOUNTING, FALSE DISCLOSURES, AND
       INADEQUATE INTERNAL CONTROLS CONCERNING STOCK
       OPTION GRANTS .......................................................................................... 34

       A.     The Restatement and GAAP Violations ........................................... 34

       B.     Officer Defendants............................................................................. 35

       C.     Committee Defendants ....................................................................... 39

       D.     Confidential Witness Allegations...................................................... 43

       E.     AMT's Lack of Internal Controls...................................................... 47

VII.   AMT'S RESTATEMENT OF PREVIOUSLY REPORTED FINANCIAL STATEMENTS ........................................................................................................ 49

    A.   Increases to Stock-Based Compensation Expense Owing to Revised Accounting Measurement Dates ................................................................ 52

    B.   Increases to Stock-Based Compensation Expense Owing to Modified and Repriced Stock Option Grants ..................................................... 55

    C.   Tax-Related Restatement Adjustments ........................................................... 56

VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........................................................................................................ 57

IX.    LOSS CAUSATION ...................................................................................................... 97

X.     CLASS ACTION ALLEGATIONS .......................................................................... 100

XI.    PRESUMPTION OF RELIANCE UNDER THE *AFFILIATED UTE* AND FRAUD-ON-THE-MARKET DOCTRINES ...................................................... 102

XII.   THE SAFE HARBOR PROVISION OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 IS INAPPLICABLE ............................. 103

XIII.  CLAIMS FOR RELIEF ............................................................................................. 103

    COUNT I  Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Asserted Against All Defendants) ...................... 103

    COUNT II  Violations of Section 20(a) of the Exchange Act (Asserted Against the Individual Defendants) ................................................................ 107

XIV.   PRAYER FOR RELIEF .............................................................................................. 108

XV.    DEMAND FOR JURY TRIAL ................................................................................. 109

Court-appointed Lead Plaintiff Steamship Trade Association-International Longshoremen's Association Pension Fund ("Lead Plaintiff"), individually and on behalf of all other similarly situated persons and entities, by its undersigned counsel, for its Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws against American Tower Corporation ("AMT" or the "Company") and other Defendants named herein, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon, among other things, (i) review and analysis of annual reports, quarterly reports, current reports, proxy statements, and other documents filed publicly by AMT with the Securities and Exchange Commission (the "SEC"); (ii) review and analysis of press releases, public statements, news articles, and other publications issued by or concerning AMT; (iii) an investigation conducted by and through Lead Plaintiff's attorneys, including interviews with numerous former AMT employees; and (iv) other publicly available information and data concerning AMT and its stock options. Lead Plaintiff believes that substantial additional evidentiary support for the allegations herein will exist after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a securities class action brought on behalf of all persons and entities, other than Defendants and certain other excluded persons defined below, who purchased or otherwise acquired shares of common stock of AMT between April 1, 2002 and May 22, 2006, inclusive (the "Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    This action involves knowing and reckless fraudulent conduct carried out at the highest levels of AMT's management and with the cooperation of the Company's Board of Directors. Defendants' long-running scheme, which was effectively an official but undisclosed Company policy, involved the manipulation of stock option grants to the Individual Defendants and other AMT officers,

directors, and employees so that the stock options, when granted, were "in the money" options and thus exercisable. At the same time, AMT accounted for such stock option grants as though the options had been granted at the then-current market price of AMT stock, thus manipulating the Company's reported financial statements in violation of Generally Accepted Accounting Principles ("GAAP"), and represented to the public that the option grants had been accounted-for in accordance with GAAP. In what became a policy generally known throughout the corporate ranks but undisclosed to the market, AMT executives backdated option grants to obtain a lower exercise price, making their options more valuable when exercised in the future. By backdating stock options, AMT used information about how the market for AMT stock behaved in the past—akin to betting on a horse race after the race is over. Through this scheme, certain Individual Defendants personally profited by millions of dollars. Such profits constituted undisclosed and unaccounted-for compensation during the Class Period. The backdating scheme materially distorted AMT's reported profitability by understating its compensation expenses and overstating its net income and understating its net losses, in violation of GAAP.

3.   On May 16, 2006, in what would be the first public disclosure of the Company's stock option backdating policy, the Center for Financial Research and Analysis, Inc. ("CFRA") issued a report spotlighting AMT as one of 16 companies that potentially engaged in stock option backdating (the "CFRA Report"). On May 19, 2006, AMT announced that as a result of the CFRA Report, it established a "Special Committee" to conduct an internal investigation of the Company's stock option practices, and that the SEC had launched an inquiry. A series of news articles followed concerning the SEC inquiry and noting the CFRA Report, and specifically mentioning AMT. Between May 17 and 22, 2006, as a direct result of these disclosures, AMT common stock fell $4.16, or 12.32 percent—a loss of approximately **$1.745 billion** in market capitalization.

4.       Lead Plaintiff and other Class members purchased AMT common stock during the Class Period at artificially inflated prices, and were damaged when the artificial inflation came out of the stock price as a result of these partially and fully corrective disclosures.

5.       In a Form 10-K/A Amended Annual Report filed with the SEC on November 29, 2006, AMT made a final accounting of the options backdating scheme and its impact on AMT's financial position during the Class Period.  In this restatement of previously issued financial statements (the "Restatement"), AMT admitted that its financial statements for the years 1998 through 2005 were materially false and presented in violation of GAAP.  AMT further admitted: (a) that the grant dates reported for accounting and financial reporting purposes for "most" stock option grants between the time AMT became a public company in 1998 and into 2005 were incorrect; (b) that from June 1998 through 2004, for large annual grants and many other individual grants to employees, AMT management intentionally "followed a practice," apparently called "lookbacks," of choosing past dates as grant dates so as to use a lower and thus more favorable exercise price; (c) that the option grants involving "lookbacks" were contrary to AMT's public disclosures that grants were made at fair market value, were not accounted for properly, and to an large extent violated the Company's written stock option plan; (d) that option grants not involving "lookbacks" were also improperly manipulated because those grants were formally approved "many months" after the grant date recorded by the Company for accounting and reporting purposes; (e) that past management frequently looked back to select option grant dates, and at least one member of past management knew that by backdating options, the Company was failing to account for the options properly and was making false statements; (f) that other former executives should have been aware of the accounting and legal ramifications of the options manipulation practices; (g) that current executives were aware of the improper use of "lookbacks" and should have been aware of its accounting and legal ramifications; (h) that the Board of Directors and the Compensation Committee failed to adopt adequate procedures to ensure that Compensation Committee members

understood the Stock Option Plan and that it was properly administered; and (i) from 1998 through 2005, the Company's processes, procedures and internal controls were inadequate.

## II.   JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. AMT maintains its corporate headquarters and principal executive offices in this District.

9.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of national securities markets.

## III.   THE PARTIES

10.     Lead Plaintiff Steamship Trade Association-International Longshoremen's Association Pension Fund is an institutional investor established as a result of certain collective bargaining agreements between the Steamship Trade Association of Baltimore, Incorporated ("STA") and the International Longshoremen's Association (AFL-CIO) ("ILA").  As set forth in its certification previously filed with the Court, Lead Plaintiff purchased shares of common stock of AMT during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

11.     Defendant American Tower Corporation is a wireless and broadcast communications infrastructure company that describes itself as the leading independent owner, operator and developer of broadcast and wireless communications sites in North America. The Company was created in 1995 as a subsidiary of American Radio Systems Corporation ("American Radio") and was spun-off into a free-standing public company in June 1998. AMT leases antenna space on multi-tenant communications sites to wireless service providers and radio and television broadcast companies. AMT owns and operates more than 22,000 communications sites in the United States, Mexico, and Brazil, and manages approximately 2,000 revenue-producing rooftop and tower sites. AMT is a Delaware corporation with principal executive offices located at 116 Huntington Avenue, Boston, Massachusetts 02116.

12.     Defendant Steven B. Dodge ("Dodge") founded the Company and was Chairman of the Board of Directors, President, and Chief Executive Officer from 1995 until September 2001. Dodge continued to serve as CEO until October 2003, and as Chairman of the Board until February 13, 2004. Dodge was also Chairman, President and CEO of American Radio from its founding in November 1993 until AMT became an independent public company. Because of Dodge's positions, he caused or permitted the backdated and manipulated stock options described herein to be granted. Moreover, Dodge was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the Class Period, Dodge participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

13.     Defendant James D. Taiclet, Jr. ("Taiclet") is Chairman of the Board and President and CEO of AMT. Taiclet joined AMT in September 2001 as President and Chief Operating Officer and became CEO in October 2003. Taiclet has been a Director of AMT since November 2003, and became Chairman on February 13, 2004. Because of his positions, Taiclet caused or permitted the backdated

5

and manipulated stock options described herein to be granted. Moreover, Taiclet was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the Class Period, Taiclet participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

14.     Defendant Bradley E. Singer ("Singer") has been Chief Financial Officer ("CFO") and Treasurer of AMT since December 2001. Singer joined AMT in September 2000 as Executive Vice President, Strategy, became Vice President and General Manager of the Southeast Region in November 2000, and became Executive Vice President, Finance in July 2001. Because of his positions, Singer caused or permitted the backdated and manipulated stock options described herein to be granted. Moreover, Singer was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, and conversations and connections with other corporate officers and employees. During the Class Period, Singer participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

15.     Defendant Jean A. Bua ("Bua") has been Executive Vice President of Finance and Corporate Controller of AMT (the Company's Principal Accounting Officer) since August 15, 2005. Because of her positions, Bua caused or permitted the backdated and manipulated stock options described herein to be granted. Moreover, Bua was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. She also had access to internal corporate documents and conversations and connections with other corporate officers and employees. During the Class Period, Bua participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

16.     Defendant Timothy F. Allen ("Allen") was Vice President of Finance and Corporate Controller of AMT (the Company's Principal Accounting Officer) from April 2003 until August 2005. Allen joined AMT in February 1999 as Manager of Financial Reporting and was appointed Vice President of Finance in February 2002. Because of his positions, Allen caused or permitted the backdated and manipulated stock options described herein to be granted. Moreover, Allen was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents and conversations and connections with other corporate officers and employees. During the Class Period, Allen participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

17.     Defendant Justin D. Benincasa ("Benincasa") was AMT's Senior Vice President and Corporate Controller (the Company's Principal Accounting Officer) from prior to the Company's inception as a public company until April 2003. Because of his positions, Benincasa caused or permitted the backdated and manipulated stock options described herein to be granted. Moreover, Benincasa was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents and conversations and connections with other corporate officers and employees. During the Class Period, Benincasa participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

18.     Defendant Pamela D.A. Reeve ("Reeve") has been a member of the Board of Directors since March 2002. Reeve has been a member of the Board's Compensation Committee since May 2002, and a member of the Board's Audit Committee since August 2002. AMT's 2004, 2005, and 2006 Proxy Statements filed with the SEC each state that Reeve is "an 'audit committee financial expert' under the rules of the SEC and has the accounting and/or related financial management expertise required under

7

the rules of the NYSE," and that Reeve is "financially literate." Because of her positions, Reeve caused or permitted the backdated and manipulated stock options described herein to be granted. Moreover, Reeve was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. She also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board and committee meetings. During the Class Period, Reeve participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

19.     Defendant Carolyn F. Katz ("Katz") has been a member of the Board of Directors since February 2004. Katz has been a member of both the Compensation Committee and Audit Committee since April 2004. AMT's 2005 and 2006 Proxy Statements filed with the SEC each state that Katz is "an 'audit committee financial expert' under the rules of the SEC and has the accounting and/or related financial management expertise required under the rules of the NYSE," and that Katz is "financially literate." Because of her positions, Katz caused or permitted the backdated and manipulated stock options described herein to be granted. Moreover, Katz was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. She also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board and committee meetings. During the Class Period, Katz participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

20.     Defendant Mary Agnes Wilderotter ("Wilderotter") was a member of the Board of Directors from August 1998 until May 2004. Wilderotter was a member of the Compensation Committee from November 1998 until May 2004, and a member of the Audit Committee from March 2001 until May 2004. AMT's 2004 and 2005 Proxy Statements filed with the SEC each state that Wilderotter is "financially literate." Because of her positions, Wilderotter caused or permitted the

backdated and manipulated stock options described herein to be granted. Moreover, Wilderotter was aware of non-public information about the business of AMT, as well as its finances, markets and present and future business prospects. She also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board and committee meetings. During the Class Period, Wilderotter participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and SEC filings.

21.     Defendants Dodge, Taiclet, Singer, Bua, Allen, and Benincasa are referred to collectively herein as the "Officer Defendants." Defendants Reeve, Katz, and Wilderotter are referred to collectively herein as the "Committee Defendants." The Officer Defendants and Committee Defendants are referred to together as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     How Stock Options Work

22.     Stock options are agreements that allow individuals to purchase publicly traded stock at a predetermined, fixed price on a later date. Stock options allow recipients to profit if the market price of the stock exceeds the price at which the options are granted, known as the "strike price" or "exercise price." Unless otherwise stated, stock options are granted with an exercise price equal to the market value of the common stock on the date on which the options are granted. Accordingly, at the time the options are granted they have virtually no value, and companies are not required to incur any accounted-for expense associated with such grants. Options have been viewed as tools to incentivize executives, managers and employees while simultaneously avoiding a direct compensation expense by aligning the grantees' future with that of the company—if the stock and company grow, so do the personal profits to the grantee.

23.     For example, if a company grants an employee an option to purchase 100 shares with an exercise price of $10 per share, the employee can buy 100 shares for $1,000 regardless of the actual

9

market price of the stock on the date the options are exercised. In this example, if the price of the stock rises during the option term from $10 to $20 per share, the employee exercising the option at $10 per share will pay a total of $1,000 for 100 shares of stock that are, at the time of purchase, worth $20 per share or $2,000. This employee will immediately realize a $1,000 "paper" profit. However, if the strike price is greater than the market price of the company's stock, the option is described as "underwater" or "out of the money." Conversely, if the strike price is less than the market price, the option is described as "in the money."

24.     When a company grants stock options to an employee, it must do so under a written stock option plan that is filed with the SEC, so that investors presumably have an accurate understanding of the compensation being paid to certain employees and giving an accurate view of the Company's financial position. Given that the stock option plan is publicly filed, the company's management and directors, particularly those who sign the SEC filings attaching the plan, are familiar with the terms of the plan and how it is supposed to operate.

### B.     Backdating Options

25.     Starting in the 1990s, companies competing for top sales, management and development talent lured prospective employees with generous signing bonuses and potentially lucrative stock options should the company experience sufficient growth to result in increased share value. As has been widely reported in the financial press, many companies granting stock options have granted them at a price below the market price on the date of the grant, essentially giving employees "in the money" stock options at the time of grant. This resulted in a direct form of compensation to the employee because the company was required to deliver stock to the employee at below fair market value, and the company met its obligation to deliver the stock either by purchasing such shares at a higher price in the open market or delivering treasury stock, which had a higher fair market value, to the employee. All option

grants must be made in accordance with the stock option plan on file with the SEC, otherwise truthfully disclosed to the market, and properly accounted-for in the company's financial statements.

26.    Where a company's manipulation of options violates its stock option plan, is not disclosed, and is not properly accounted-for in the financial statements, it is fraud. Arthur Levitt, former Chairman of the SEC, recently described backdating schemes as "represent[ing] the ultimate in greed. It is stealing, in effect. It is ripping off shareholders in an unconscionable way." Charles Forelle and James Bandler, *Five More Companies Show Questionable Options Pattern*, Wall St. J., May 22, 2006, at A1.

27.    SEC Chairman Christopher Cox, in testimony before the United States Senate Committee on Banking, Housing, and Urban Affairs on September 6, 2006, explained why options backdating schemes like AMT's are so harmful:

> Thank you for inviting me to testify today about options backdating. This issue is one of intense public interest because it strikes at the heart of the relationship among a public company's management, its directors, and its shareholders.
>
> *        *        *
>
> There are many variations on the backdating theme. But here is a typical example of what some companies did: They granted an "in-the-money" option—that is, an option with an exercise price lower than that day's market price. They did this by misrepresenting the date of the option grant, to make it appear that the grant was made on an earlier date when the market value was lower. That, of course, is what is meant by abusive "backdating" in today's parlance.
>
> The purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains—without the company having to show it as compensation on the financial statements.
>
> Rather obviously, this fact pattern results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws.
>
> The SEC has been after the problem of abusive options backdating for several years.
>
> *        *        *
>
> [J]ust as option compensation increased, so did the potential for abuse. . . . These cases demonstrate some of the variations on the basic theme of fraudulent backdating that the Commission has uncovered. They involve backdated option grants that are more profitable to recipients; backdated option exercises that reduce recipients' taxes at the

11

expense of shareholders; options granted to top executives; and options granted to rank and file employees. They involve actual personal gain to wrongdoers, and real harm to companies that failed to properly account for the options practices.

(Available on the SEC's website at http://www.sec.gov/news/testimony/2006/ts090606cc.htm.)

## C. Defendants' Scheme

28. According to AMT's Proxy Statements, the stated purpose of the Company's Stock Option Plan was to "attract, motivate and retain the highest quality executive officers," and to provide incentives for such persons to exert maximum efforts to create long-term success at the Company. During the Class Period, AMT made particularly heavy use of stock options to compensate its executives, and indeed relied on stock options as its sole form of long-term incentive compensation. As disclosed in its 2007 Proxy Statement, the Company does not provide "extensive perquisites" to its executive officers beyond ordinary benefits available to all employees, and, instead, "historically [has] weighted [its] total executive compensation heavily toward stock options that vest over time." AMT relied on stock options not only as a major component of executive compensation, but also liberally used option grants to motivate *all* of its many hundreds of employees, with "a broad-based stock option program in which every new full-time employee hired by us is eligible to receive an option to purchase at least 300 shares of our Common Stock." Employees also received stock options annually based on performance pursuant to an "all-employee" grant.

29. In fact, AMT's stock option grant programs were so important to upper management and central to the Company's hiring and operations that, as alleged below, the Company's Senior Vice President for Human Resources kept her office not within the Human Resources and Information Systems Department near her subordinates, but rather within the "Executive Circle" together with the CEO (to whom she directly reported), the CFO, the General Counsel, and other top executives.

30. This action arises as a result of AMT's heavy reliance on the use of stock options for compensation and the "ultimate greed" described by former SEC Chairman Levitt. AMT and its

management engaged in a pervasive scheme in which they systematically violated the Company's publicly filed plans for, and made false statements about, stock option grants in order to enrich themselves. This was done without regard to the Company's actual performance and to hide the true impact that the cost of these option grants had on the Company's earnings per share, net income, compensation expenses, and related tax expenses. The Officer Defendants carried out this scheme by intentionally selecting a more favorable price for option grants that had previously been granted at a higher price, and reporting false exercise dates for options where the price of AMT stock was substantially lower on the reported exercise date than on the date the option was actually exercised. Defendants also used the option grant dates selected and proposed by management for reporting and accounting purposes where those option grants had not yet been approved by the Compensation Committee, as required by the Company's Stock Option Plan.

31.     This scheme, and the false accounting that took place pursuant thereto, concealed AMT's true financial condition from shareholders and made AMT appear to be a substantially more successful company than it actually was. In making AMT appear to be a substantially more successful company than it actually was, Defendants doubly enriched themselves by virtue of the resulting artificial inflation in the Company's stock price.

32.     Defendants also used "backdoor options" funneled through a foreign subsidiary as a means of hiding massive amounts of additional undisclosed executive compensation from AMT shareholders, thus distorting the Company's reported compensation information and financial statements. *Fortune* magazine reported on this scheme on October 17, 2006:

> As backdating options continues to ensnare corporate officers, a Boston-based company called American Tower has faced questions from the SEC and U.S. Attorney's office over its use of backdating. ***But backdating isn't the only eyebrow-raising element of their compensation strategies.***
>
> American Tower has a market cap of $15 billion and owns the infrastructure, such as towers and rooftop structures, that wireless companies lease. Last May the company

13

announced that a special committee of independent directors was reviewing its option-granting practices; in September, American Tower said it will have to restate more than three years of financial results. ***But a close look at its filings also reveals that top executives have made tens of millions from stock in subsidiary companies—information you won't see in the compensation table of its proxy statement.***

In the standard table in American Tower's proxy—the one that lists the salaries, bonuses and other compensation for the five highest-paid employees—you see that an executive named Michael Gearon, the company's vice chairman and the president of its international business, has earned $2 million in cash over the past three years and has gotten 665,000 options.

In 1998, Gearon sold Gearon Communications to American Tower and joined the company. He still lives in Atlanta, where his firm was based, and is a part-owner of the Atlanta Hawks. General counsel William Hess earned $1.8 million in cash and got 370,000 options over the past three years.

But in the tables detailing options exercises there's a footnote that says that during 2004, American Tower's Brazil operation, called ATC South America, granted "certain employees," including Gearon and Hess, options to purchase common stock of ATC South America at an exercise price of $1,349 per share. Those separate options were exercised in October 2005.

The footnote says that the "value realized" by Gearon and Hess was approximately $11.5 million and $2.7 million, respectively, and refers you to another section of the proxy called "Related Party Transactions." This section of proxies became notorious in the wake of Enron, because it's where CFO Andy Fastow's infamous partnerships were actually disclosed to investors.

In this section of American Tower's proxy, you learn that in March 2004 Gearon paid $1.2 million for a 1.6 percent stake in ATC South America; in October 2005, American Tower expects to pay him $3.7 million for that stake. Plus, Gearon got options—worth some $11.5 million a year and a half later—to acquire 6.7 percent of ATC South America. (Hess's options allowed him to acquire 1.6 percent of ATC South America.)

And you learn about another entity, ATC Mexico. Back in 2004, Gearon and Hess exercised their "previously disclosed" rights to require American Tower to buy their stakes in that entity. Afterward Gearon collected $36.2 million, much of it in American Tower stock that has since more than tripled.

If you check American Tower's 2005 10-K, you'll learn—in footnote 11—that Gearon used just $1.7 million of cash plus a $6.7 million loan from American Tower to buy his stake in ATC Mexico.

So Gearon picked up cash and stock worth well over $30 million (a figure that doesn't take into account the stock's recent uptick) in these side deals—payments that aren't reflected in the compensation table in the proxy.

14

Hess and the others got some $20 million.

Bethany McLean, *Creative Comp at American Tower,* Fortune, Oct. 30, 2006, at 38 (emphases added).

### D.    AMT's Stock Option Plan

33.    On or about November 5, 1997, the Board of Directors of American Tower Systems Corporation, a predecessor of AMT, adopted the Company's 1997 Stock Option Plan (the "Stock Option Plan"). The Stock Option Plan was amended and restated on April 27, 1998, and its basic terms were unchanged throughout the Class Period.

34.    The Stock Option Plan, which was filed with the SEC, provides for the grant of "non-qualified" and "incentive" stock options to AMT directors, officers and employees. Generally, stock options granted under the Stock Option Plan expire ten years from the date of grant, vest ratably over a period of four years from the date of grant, and are exercisable while the grantee continues to provide services to the Company and for a specified period after such person concludes his or her service. Under the terms of the Stock Option Plan, exercise prices for incentive stock options **"shall in no event be less than . . . one hundred percent (100%) of the fair market value of the Stock on the date the [incentive stock option] is granted."** The Stock Option Plan defines fair market value as the closing sales price of a share of AMT common stock as published by the principal national exchange on which the common stock is listed.

35.    Under the Stock Option Plan, exercise prices for "non-qualified" options are set at the discretion of the Compensation Committee. As alleged herein, however, AMT repeatedly represented in SEC filings that no options, whether incentive or non-qualified, had ever been granted with an exercise price lower than the fair market value on the grant date. As of December 31, 2005, the option pool under the Stock Option Plan consisted of 32.9 million shares of common stock.

36.    The Stock Option Plan is administered by the Compensation Committee, which is composed entirely of "non-employee directors," as defined in Rule 16b-3 promulgated under the

Exchange Act, and "outside directors" as defined under Section 162(m) of the Internal Revenue Code of 1986. The Compensation Committee, as administrator, has the authority to grant awards under the Stock Option Plan and make all other determinations necessary for the administration of the Stock Option Plan. All options granted under the Stock Option Plan must be embodied in a written option agreement signed by the grantee and by the CEO, CFO, or Corporate Controller. The Stock Option Plan does not provide for the automatic grant of options to any director, officer, or employee upon any particular date or event.

### E.  AMT's By-Laws

37.     The By-Laws of the Company in effect during the Class Period authorized the Board of Directors or the Compensation Committee to act formally on option grant proposals presented by management in one of two ways. The Board or Compensation Committee could act without a formal meeting if all members of the Board or Compensation Committee consented in writing to the adoption of a resolution approving the option grants, called a "unanimous written consent." Alternatively, the Board or Compensation Committee could act by majority vote at a meeting where a quorum of the Board or Committee was present.

38.     The stated duties and responsibilities of the Compensation Committee and the findings of the Special Committee, further discussed below, indicate that the Compensation Committee purportedly delegated to management authority to award stock options to all non-executive officer employees. For option grants that required the approval of the Compensation Committee, the Committee generally approved option grant proposals through the use of unanimous written consents.

### F.  AMT's Improper Pricing of Stock Option Grants

39.     AMT's Restatement, as further alleged below, establishes that Defendants knowingly and recklessly disregarded the Stock Option Plan and manipulated the dates on which options were reported as having been granted under the Plan in order to award grants at lower exercise prices than were

permitted under the Plan. It further establishes that Defendants then accounted for the option grants in violation of GAAP and falsely stated, as detailed below, that all options granted under the Stock Option Plan had been granted at fair market value on the date of grant.

40.     The Officer Defendants' motive for implementing and executing this scheme is obvious. By changing a grant date with a given strike price to a grant date with a lower—and therefore more favorable—strike price, the Individual Defendants who were granted options would be able to reap significant profits for themselves. As explained in detail herein, certain Officer Defendants consistently granted themselves options at or near a significant dip in the stock price which had already occurred. The Compensation Committee, which administers the Company's Stock Option Plan, gave rubber-stamp approval to these option grants, and the Audit Committee failed in its responsibility to oversee AMT's accounting for and disclosure of stock option grants and the presence of internal controls and procedures regarding those grants. All of the Committee Defendants were members of both the Compensation Committee and the Audit Committee during the Class Period, generally at the same time, and thus were doubly derelict and reckless in their duties.

41.     During the Class Period, Defendant Taiclet received 1.8 million AMT stock options. Taiclet exercised 287,498 options at a total price of $799,185.36, for actual profits of $5,641,953.52. Defendant Singer received 1.71 million AMT stock options. Singer exercised 349,994 options at a total price of $1,499,431.76, for actual profits of $5,591,157.06. Defendant Allen received 266,500 AMT stock options. Allen exercised 18,917 options at a total price of $47,428.78, for actual profits of $166,333.32. Further, during the Class Period, Defendants Dodge, Benincasa, and Bua received 600,000; 103,335; and 125,000 AMT stock options respectively. Defendants Katz, Reeve, and Wilderotter received 45,000; 40,000; and 20,000 AMT stock options respectively.

42.     Based on information contained in AMT's Proxy Statements filed with the SEC, certain of AMT's stock option grants to the Company's top executives and employees before and during the

17

Class Period are shown graphically below in the context of the month prior to and the month after they were granted. As the charts illustrate, the grant dates of options were carefully chosen to ensure that options were granted when AMT's stock price was at or near a low point during this time period. Side-by-side comparison of these grant dates with a graphic representation of the S&P 500 index during the same time periods underscores and illustrates AMT's admission that the beneficial nature of the grant dates was neither random nor coincidental:

 

43.     The option grants on September 21, 2000 were made to Defendants Dodge (300,000 options) and Wilderotter (15,000 options) and other directors and executives. The exercise price of the September 21, 2000 option grant, $30.63, was the lowest closing price that month and the entire fiscal quarter.



44.     The exercise price for the September 7, 2001 option grant, $11.00, was the lowest closing price that month and the entire fiscal quarter. The option grants on November 7, 2001 were made solely to Defendant Taiclet (500,000 options). The exercise price for the November 7, 2001 option grant, $5.98, was the lowest closing price that month.



45.     The option grants on November 14, 2002 were made to Defendant Allen (35,000 options) and one other executive. The exercise price for the November 14, 2002 option grant, $1.55, was the lowest closing price that month. The option grants on December 9, 2002 were made to Defendants Dodge (300,000 options), Singer (250,000 options), Taiclet (125,000 options), Wilderotter

(10,000 options), Reeve (10,000 options) and other directors and executives. The exercise price of the December 9, 2002 option grant, $3.04, was the lowest closing price that month.

46.    The timing of the December 9, 2002 option grant is additionally suspicious because the following next day, December 10, the Company announced that it signed a major agreement with NII Holdings, Inc. ("NII") to expand its infrastructure holdings by purchasing 535 communication towers in Mexico for $100 million. AMT stock closed at $3.04 on December 9. Beginning on December 10, when the stock closed at $3.26, AMT stock steadily increased until it closed at $4.00 on December 17, a 33 percent increase from December 9. It appears that Defendants "springloaded" this option grant by selecting December 9 as the grant date, knowing full well that the NII agreement would be signed the next day and that AMT stock would likely rise as a result. Indeed, according to NII's SEC filings, Defendant Katz has served on NII's Board of Directors since November 12, 2002.



47.    The option grants on November 17, 2003 were made to Defendants Dodge (300,000 options), Singer (275,000 options), Taiclet (375,000 options) and other executives.

 

48.     The exercise price of the August 8, 2005 option grant was the lowest closing price for that month.  The option grants on August 15, 2005 were made solely to Defendant Bua (100,000 options).

### G.      The Review and Findings of AMT's Special Committee

49.     On May 16, 2006, CFRA, a financial analysis and forensic accounting research firm with a wide subscriber base, issued a research report titled *Options Backdating—Which Companies are at Risk? A Survey of the Top 100 Users of Stock Options 1997-2002*.  The CFRA Report analyzed stock options granted to top executives of the 100 companies that granted the most stock options between 1997 and 2002. The CFRA Report observed that among these 100 companies, AMT and 16 others, "on three or more occasions, granted options to executives at exercise prices and dates that matched exactly or were close to a 40-day low in the company's stock price."  The CFRA Report concluded that AMT and the other companies potentially engaged in stock option backdating, and noted that such companies face several risks including SEC investigations and accounting restatements.

50.     On May 19, 2006, in response to the CFRA Report, AMT formed a Special Committee composed of "independent" directors to investigate the Company's stock option practices. The Special Committee reviewed substantially all stock options granted by the Company from June 1998, when

AMT became a public company, through May 2006, including all option grants to Company officers and directors, all option grants to individuals in excess of 100,000 shares, and all option grants to employees in connection with the Company's annual all-employee option grant program.

51.     On August 7, 2006, while the Special Committee's review and investigation was in progress, AMT determined that a restatement of its previously issued financial statements was "likely" and, accordingly, that the financial statements and the related audit opinions in the Company's prior filings with the SEC "should no longer be relied upon."

52.     On November 6, 2006, the Special Committee reported its findings to the Board of Directors.  The Special Committee concluded that the option grant dates reported by AMT for accounting and financial reporting purposes for **"most"** stock option grants from June 1998, when AMT became a public company, and into 2005 were "incorrect because they did not reflect the dates on which the grants were legally effective."

53.     The Special Committee found that from June 1998 through 2004, members of AMT's management "followed a practice of choosing past dates as grant dates so as to use a lower exercise price, with the period of lookback appearing to range from a couple of days to eight weeks."

54.     The Special Committee found that the options grants involving lookbacks (a) were "inconsistent" with the Company's disclosures in SEC filings that option grants were made at fair market value, (b) were not accounted for properly, and (c) to the extent the grants involved incentive options, "violated the requirement under the Company's 1997 Stock Option Plan that they be at fair market value."

55.     The Special Committee further found that to the extent the Compensation Committee delegated to management the authority to grant stock options, that delegation "was not adequately documented" and, for that reason, the necessary legal approval of stock option grants did not occur until they were later approved by the Compensation Committee.

56.     The Special Committee explained that the process by which the Compensation Committee formally approved option grants involved the signing of unanimous written consents that included schedules of option grants approved by management for the previous quarter.  While the Company typically used the date set forth in the schedules attached to the written consents as the option grant date, all necessary corporate action had not been taken until the written consents were actually signed by all committee members, and that typically did not happen until later.  According to the Special Committee, this resulted in a delay of many months between the date recorded by the Company as the option grant date and the legal grant date.

57.     The Special Committee found that AMT's option practices were *"flawed,"* and began with "past management, whose members frequently looked back to select option grant dates."  The Special Committee stated that the evidence it reviewed indicated that one past member of management *"likely"* was aware that, in looking back to choose a past grant date with a more favorable closing price, the Company was failing to take necessary accounting charges or acting contrary to the Company's disclosures.

58.     In a serious understatement and attempt at whitewash, the Special Committee also found that members of past management who initiated and were involved with the option practices *"should have been aware"* of the accounting and legal issues or sought legal and accounting advice as to the practice.

59.     With respect to current management, the Special Committee found—in similarly bland and understated language—that some members of current management "were made aware of the use of lookbacks for certain option grants, and certain of them should have been aware of the accounting or legal issues or inquired further."

60.     The Special Committee found that outside lawyers for the Company were told of the lookback practice on multiple occasions and did not advise the Company of the accounting and legal problems with that practice.

61.     The Special Committee found that the Board of Directors and the Compensation Committee failed to adopt adequate procedures to ensure that Compensation Committee members understood the Company's 1997 Stock Option Plan and that it was properly administered.

62.     Finally, the Special Committee found that from 1998 through 2005, the Company's processes, procedures and controls were "inadequate" and the Company also had "inadequate controls" relating to, and failed to account properly for, modifications of outstanding stock options.

### H.     The Compensation Committee's Revised Option Grant Procedures

63.     In August 2006, the Compensation Committee, in connection with the Special Committee's investigation, revised its procedures for the approval and administration of stock option grants.  As described in AMT's 2007 Proxy Statement, filed on March 22, 2007, the Compensation Committee implemented "new procedures" regarding stock option grants.

64.     These "new procedures" include the following two rules: (a) "unless otherwise expressly approved by the Compensation Committee, the exercise price for all stock option grants will be equal to the closing price of our Common Stock on the NYSE on the date of grant"; and (b) "at or prior to the time the Compensation Committee meets or takes action by unanimous written consent to approve stock option grants, the Compensation Committee shall receive a complete schedule setting forth all details of the proposed option grants, and the date of grant for such options will be the first business day of the calendar month following Compensation Committee action approving such grants or a future date specified by the Compensation Committee in such approval."

65.     These two unremarkable and seemingly obvious procedures plainly should have been in place since the Stock Option Plan was adopted, and acknowledge AMT's and the Compensation Committee's total failure in this area.

I.     **AMT's Remediation Plan**

66.     After reporting its findings to the Board of Directors, the Special Committee proposed a "Remediation Plan" to the Board to "address the issues" raised by the findings. The Board approved the Remediation Plan on December 19, 2006.

67.     Under the Remediation Plan, the Company eliminated any benefit received by its present directors and senior officers from options having been backdated. This measure eliminated improper benefits of approximately $7.5 million. For unexercised options, the Company increased the exercise price to fair market value as it should have been from the start. For exercised options, directors and senior officers either paid back the money or had an equal amount of vested, in-the-money stock options canceled. Eight persons were subject to this remediation measure.

68.     The Company similarly eliminated any benefit received by "certain" former officers who received stock options at below fair market value. Approximately $7.6 million in improper benefits to three former officers were eliminated.

69.     The Company also agreed to re-evaluate its revised procedures for the approval and administration of stock option grants, which had been approved by the Compensation Committee in August 2006, and monitor those procedures for "effective implementation and compliance as part of the internal audit function."

70.     The Company also agreed, among other things, to assess "the organization's attitude toward a culture of compliance and an effective internal control environment."

71.     Defendants have thus admitted: (a) that AMT's stock option practices were "flawed"; (b) that most of the stock options issued since AMT became a public company were intentionally and improperly manipulated in order to provide monetary benefits to the recipients; (c) that these option grants were accounted for incorrectly; (d) that Defendants' financial statements that were restated were materially false and misleading; (e) that Defendants falsely stated to the market that option grants were

made at fair market value; (f) that Defendants' grants of incentive options violated AMT's 1997 Stock

Option Plan; (g) that at least certain members of past and current management knew about this

wrongdoing and its accounting and legal ramifications; and (h) that the Company's internal controls

relating to stock option grants were completely inadequate and insufficient. These admissions

demonstrate that AMT effectively had a corporate policy to intentionally manipulate stock option grants

and to conceal such wrongdoing in the Company's public disclosures and financial statements.

## V.    AMT ADMITS THAT IT BACKDATED AND MANIPULATED STOCK OPTION GRANTS AND THAT ITS FINANCIAL STATEMENTS ARE FALSE

72.    On May 19, 2006, prompted by the wrongdoing uncovered by the CFRA in its Report,

AMT issued a press release titled "American Tower Corporation Announces Inquiry into Stock Option

Practices." The press release was also filed with the SEC as an exhibit to a Form 8-K Current Report

signed by Defendant Singer. In this press release, the Company revealed for the first time that its stock

option grant practices were likely fraudulent and that the Company had commenced an internal review

into the matter, that the Company might need to restate its historical financial statements, and that the

SEC had launched an informal inquiry:

> American Tower Corporation (NYSE: AMT) today announced that its Board of Directors *has created a special committee comprised of independent directors to conduct an internal review of the Company's historical stock option practices and related accounting.* The special committee will be assisted by independent legal counsel and advisors.
>
> The Company initiated this review following the release of a third party research report regarding practices related to the timing and pricing of stock option grants. *Depending on the outcome of this review, the Company may need to correct its historical determinations of non-cash stock-based compensation expense and, if such corrections are material, it could result in the need to restate the Company's financial statements.* Although the impact to the Company's historical financial statements, if any, is not yet known, the Company does not expect the review to result in material changes to its historical revenues or non-option related operating expenses, nor would it have a material impact on the Company's cash flow from operations.
>
> The Company also announced that, subsequent to the formation of the special committee and the events described above, it received a letter of informal inquiry from

the Securities and Exchange Commission requesting documents related to Company stock option grants and stock option practices. The Company intends to cooperate fully with the SEC in this matter. [Emphases added.]

73.    On May 23, 2006, AMT issued a press release titled "American Tower Corporation Announces Update Regarding Stock Option Matter." The press release was also filed with the SEC as an exhibit to a Form 8-K Current Report signed by Defendant Singer. The press release disclosed that the United States Attorney for the Eastern District of New York had subpoenaed the Company for documents concerning its stock option grant practices and that AMT was suspending a previously announced stock buy-back program:

> American Tower Corporation (NYSE: AMT) today announced that it received a subpoena from the office of the United States Attorney for the Eastern District of New York requesting documents related to the Company's historical stock option practices. This request follows the Company's announcement on May 19, 2006 that it had established a special committee of independent directors to conduct an internal review of its stock option practices and related accounting, and that the Company had received a letter of informal inquiry from the Securities and Exchange Commission requesting documents related to Company stock option grants and stock option practices. The Company intends to cooperate fully with the United States Attorney and the SEC with respect to their requests.

> The Company also announced that, in light of the uncertainty surrounding these requests and its pending internal review, the Company has decided to temporarily suspend repurchases under its stock repurchase program. As previously announced, the Company's Board of Directors approved the repurchase of up to $750 million of the Company's Class A common stock during the period November 2005 through December 2006. The Company expects that, once its internal review is completed and this matter is resolved, it will resume repurchases of its Class A common stock in accordance with its previously announced program.

74.    On July 28, 2006, AMT issued a press release entitled "American Tower Corporation Plans Release and Conference Call on Second Quarter Results and Announces Update Regarding Stock Option Matter." The press release was also filed with the SEC as an exhibit to a Form 8-K Current Report signed by Defendant Singer. The press release announced that the "Special Committee" appointed to review the Company's stock option grant practices had reached a "preliminary conclusion" that Defendants had indeed engaged in improper stock option backdating:

The Company also announced an update on the internal review of the Company's stock option grant practices. As previously announced, the Company's Board of Directors has appointed a special committee of independent directors to conduct a review of the Company's stock option grant practices and related accounting. The special committee is being assisted by independent legal counsel and accounting experts. The Company announced that the special committee has reached a *preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants likely differ from the recorded grant dates of such awards.* As a result, the Company anticipates that it may need to record additional non-cash charges for stock-based compensation expense relating to these option grants.

The special committee has not completed its investigation and is continuing its review of these matters. *As a result, the Company has not yet determined the amount of any such compensation charges or the related tax impact. In the event that the Company determines that these items are material, it may be required to restate its financial statements for the relevant prior fiscal periods.* Although the impact to the Company's financial statements and the need for restatement is not yet known, the Company does not expect the review to result in material changes to its historical revenues or non-option related operating expenses, nor would it have a material impact on the Company's cash flow from operations. [Emphases added.]

75.     On August 7, 2006, AMT issued a press release titled "American Tower Corporation Reports Selected Second Quarter 2006 Financial Results." The press release was also filed with the SEC as an exhibit to a Form 8-K Current Report signed by Defendant Singer. The press release made a series of critical disclosures concerning the Company's fraudulent backdating practices:

Stock Option Matter Update and Expected Restatement

As previously announced, the Company's Board of Directors has appointed a special committee of independent directors to conduct a review of the Company's historical stock option granting practices and related accounting. The special committee is being assisted by independent legal counsel and forensic auditors. On July 28, 2006, the Company announced that the special committee had reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants likely differ from the recorded grant dates of such awards and that, as a result, the Company may need to record additional non-cash charges for stock-based compensation expense relating to these option grants.

While the special committee has not completed its investigation and is continuing its review of these matters, *the Company has determined that a restatement of its previously issued financial statements is likely. Accordingly, the Company's management, after consultation with the Company's independent registered public accounting firm, has concluded that the financial statements and the related independent auditors' reports contained in the Company's prior filings with the Securities and Exchange Commission should no longer be relied upon.*

28

As the stock option review is not yet complete, the Company has not yet determined the aggregate amount of additional non-cash stock-based compensation expense, nor has it determined the amount of such expense to be recorded in any specific prior period or in any future period. The Company has also not yet determined the impact of any related tax consequences. The Company does not expect the review to result in material changes to its historical revenues or non-option related operating expenses, nor would it have a material impact on the Company's cash flow from operations.

As a result, the Company is unable at this time to provide detailed GAAP or non-GAAP financial results for the quarter ended June 30, 2006. The Company believes that the selected financial results presented herein would not be affected by the results of the stock option review, except as noted above with respect to the Company's selling, general, administrative and development expense, which should be considered preliminary until the Company files its Form 10-Q for the quarter ended June 30, 2006.

The Company intends to report its complete financial results and file its Form 10-Q for the quarter ended June 30, 2006 as soon as practicable once conclusions are reached regarding the impact of the stock option review on the Company's financial statements. At this time, the Company does not expect that such conclusions will be reached until after the date the Form 10-Q is required to be filed. Accordingly, the Company does not expect that it will be able to timely file its Form 10-Q for the quarter ended June 30, 2006. Assuming conclusions are reached in a timely manner, the Company expects that it will prepare and file the Form 10-Q and the necessary restated reports with the Securities and Exchange Commission in the next four to six weeks. [Emphasis added.]

76. On September 19, 2006, AMT issued a press release titled "American Tower Corporation Announces Update Regarding Restatement of Financial Statements." The press release was also filed with the SEC as an exhibit to a Form 8-K Current Report signed by the Company's Executive Vice President and General Counsel. The press release stated that the Company indeed would restate several years' worth of previously reported financial statements:

American Tower Corporation (NYSE:AMT) today announced an update regarding the Company's restatement of its financial statements. As a result of the previously announced review of its historical stock option granting practices and related accounting, the Company announced on August 7, 2006, that a restatement of the Company's previously issued financial statements was likely. **Based on facts ascertained by the special committee of the Company's Board of Directors investigating the Company's stock option granting practices and related accounting, the Company has determined that it will need to restate its previously issued financial statements to record charges for stock-based compensation expense related to certain option grants and to account for the tax-related consequences.** The special committee's investigation is ongoing and it is continuing its review of these matters.

The Company expects to file an amended Annual Report on Form 10-K/A for the year ended December 31, 2005 to reflect the restatement of its consolidated financial statements as of December 31, 2005 and 2004 and for each of the years ended December 31, 2005, 2004 and 2003. The amended Annual Report will also reflect the restatement of selected financial data as of and for the years ended December 31, 2005, 2004, 2003, 2002 and 2001. The Company also expects to file an amended Quarterly Report on Form 10-Q/A for the quarter ended March 31, 2006 to reflect the restatement of its condensed consolidated financial statements as of March 31, 2006 and for the three month periods ended March 31, 2006 and 2005. In addition, concurrently with the filing of its Form 10-K/A and Form 10-Q/A, the Company expects to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2006. [Emphasis added.]

77.     On November 8, 2006, AMT issued a press release titled "American Tower Corporation Reports Selected Third Quarter 2006 Financial Results; Announces Findings of Stock Option Review." The press release was also filed with the SEC as an exhibit to a Form 8-K Current Report signed by Defendant Singer. The press release reported the results of the Special Committee's internal investigation. The Special Committee's findings reveal, among other things, that "most" of the stock options granted since AMT became a public company were backdated:

Update on Stock Option Matter and Restatement of Financial Statements

As previously reported, the Company's Board of Directors established a Special Committee of independent directors to review the Company's stock option granting practices and related accounting. As a result of the Special Committee's preliminary conclusions, the Company previously indicated that it would need to restate its historical financial statements to record charges for stock-based compensation expense related to certain option grants and to account for the tax-related consequences. On November 6, 2006, the Special Committee reported to the Company's Board of Directors regarding its findings. The following is a summary of the Special Committee's key findings:

- The grant dates reported by the Company for accounting and financial reporting purposes for *most stock option grants during the period from the Company's becoming a public company in June 1998 and into 2005 were incorrect* because they did not reflect the dates on which the grants were legally effective.

- From June 1998 through 2004, for certain large annual grants and many other individual grants, *certain members of management followed a practice of choosing past dates as grant dates so as to use a lower exercise price, with the period of lookback appearing to range from a couple of days to eight weeks.*

30

- *The option grants involving lookbacks were inconsistent with the Company's disclosures that option grants were made at fair market value, were not accounted for properly and, to the extent they involved incentive stock options, violated the requirement under the Company's 1997 Stock Option Plan that they be at fair market value.*

- Stock options were granted by management pursuant to authority they believed had been delegated by the Compensation Committee, *but that delegation was not adequately documented, and therefore the necessary legal approval of some grants did not occur until they were subsequently approved by the Compensation Committee.*

- The process by which members of the Compensation Committee formally approved option grants involved the signing of unanimous written consents that included schedules of option grants approved by management for the preceding quarter. The Company typically used the date set forth in the schedules attached to the written consents as the option grant date. However, all necessary corporate action had not been taken until the written consents were actually signed by all committee members, which typically did not happen until later, *sometimes resulting in a delay of many months between the date recorded by the Company as the option grant date and the legal grant date.*

- *The Company's flawed option practices began with past management, whose members frequently looked back to select option grant dates. With the likely exception of one past member of management,* the evidence does not indicate that management at the time in question was aware that, in looking back to choose a past grant date with a more favorable closing price, the Company was failing to take necessary accounting charges or acting contrary to the Company's disclosures. *However, certain members of past management who initiated and were involved with the option practices should have been aware of the accounting or legal issues or sought legal and accounting advice as to the practice.*

- Current management's efforts to improve and formalize procedures for option grants since early 2004 have had the effect of eliminating the practice of lookbacks. In addition, the evidence does not indicate intentional misconduct by any member of current management. *Some members of current management, however, were made aware of the use of lookbacks for certain option grants, and certain of them should have been aware of the accounting or legal issues or inquired further.*

- One or more outside lawyers for the Company were, on multiple occasions, told of the lookback practice and did not advise the Company of the accounting and legal problems with that practice.

31

- *The Board of Directors and the Compensation Committee failed to adopt adequate procedures to ensure that Compensation Committee members understood the Company's 1997 Stock Option Plan and that it was properly administered.*

- *From 1998 through 2005, the Company's processes, procedures and controls were inadequate,* although management steadily improved the processes beginning in 2001. In 2006, the Compensation Committee revised its procedures for approving stock option grants in an effort to ensure compliance in the future.

- The Company also had inadequate controls relating to, and failed to account properly for, certain modifications of outstanding stock option rights.

The Special Committee will recommend to the Company's Board of Directors a remediation plan to address the issues raised by its findings. While the Special Committee has not yet finalized its remediation recommendations, the Special Committee has determined that no terminations or changes in responsibilities of current executive management should be made as a result of its findings. [Emphases added.]

78.     Finally, on December 20, 2006, after filing the Restatement, AMT issued a press release

titled "American Tower Corporation Reports Remediation Plan Relating to Stock Option Review;

Announces Resumption of Stock Repurchase Program." The press release was also filed with the SEC

as an exhibit to a Form 8-K Current Report signed by Defendant Singer. AMT's "Remediation Plan"

attempted to address the corporate governance and other problems caused by the Company's admittedly

fraudulent stock option backdating practices:

American Tower Corporation (NYSE: AMT) reported today that it has taken a number of actions to address the results of the review of the Company's historical stock option granting practices. As previously reported, the Company's Board of Directors established a Special Committee of independent directors to review the Company's stock option granting practices and related accounting. On November 8, 2006, the Company reported on the Special Committee's key findings, including that there were a number of deficiencies in the Company's stock option granting practices. These deficiencies contributed to the restatement of the Company's historical financial statements, which the Company filed with the Securities and Exchange Commission on November 29, 2006.

At that time, the Company reported that the Special Committee was preparing a remediation plan to address the issues raised by its findings. On December 19, 2006, the Board of Directors approved the remediation plan presented by the Special

Committee. The following is a summary of the key aspects of the remediation plan approved by the Board:

- *The Company has requested, and each of its present senior officers and members of its Board of Directors has agreed, to eliminate any benefit received by such individuals from options having been granted to them at prices below the fair market value of the Company's Class A common stock on the legal grant date, as determined by the Special Committee.* This will be accomplished by increasing the exercise price of unexercised options to such fair market value and, for exercised options, by such individuals compensating the Company for the amount of such benefit, after reduction for any taxes paid, either through a cash payment or cancelling vested options having an in-the-money value equal to the amount of the payment. The aggregate value of eliminating the benefit for the eight individuals with options subject to such remediation is approximately $7.5 million, prior to any adjustment for taxes paid.

- *The Company plans to take steps to similarly eliminate any benefit received by certain former officers from the grant to them of options at below fair market value.* The aggregate value of eliminating the benefit for the three individuals with options subject to such remediation is approximately $7.6 million, prior to any adjustment for taxes paid.

- The Company's Chief Executive Officer will continue the assessment and re-evaluation of the Company's management organizational structure, focusing on the capabilities of the legal, human resources and accounting functions, including whether the responsibilities of any members of current management should be modified.

- The Company's revised procedures for approval and administration of stock options, which were approved by the Compensation Committee in August 2006, will be independently evaluated for adequacy and then monitored for effective implementation and compliance as part of the internal audit function.

- *Additional training will be put in place with respect to governance, risk management and compliance, including as to stock option administration policies and procedures and compliance with the Company's code of conduct.*

- The Company will evaluate and enhance its risk assessment activities and the adequacy of its administrative resources and communication of roles, responsibilities and accountability. *The Company will also assess, with Board-level oversight, the organization's attitude toward a culture of compliance and an effective internal control environment.* [Emphases added.]

33

VI.   **DEFENDANTS WERE CONSCIOUSLY AWARE OF, OR
DISREGARDED WITH A HIGH DEGREE OF RECKLESSNESS, AMT'S
IMPROPER ACCOUNTING, FALSE DISCLOSURES, AND INADEQUATE
INTERNAL CONTROLS CONCERNING STOCK OPTION GRANTS**

79.     Each Defendant's scienter is readily apparent from the detailed allegations set forth
throughout this Complaint, all of which are adopted as if fully set forth in their entirety in this section.

A.     **The Restatement and GAAP Violations**

80.     The accounting improprieties admitted by AMT in the Restatement, and the violations
and lack of internal controls in the disclosure process regarding AMT's accounting of stock option
grants, were the direct result of the knowing or highly reckless conduct of AMT, the Officer
Defendants, and the Committee Defendants. The violations admitted by AMT, and the findings of the
Special Committee, involved matters and responsibilities directly charged to each of the Officer
Defendants, who served as the Company's principal executive officers, principal financial officers, and
principal accounting officers during the Class Period. The violations admitted by AMT and the Special
Committee's findings similarly involved matters and responsibilities directly charged to each of the
Committee Defendants, who served on both the Audit and Compensation Committees and had specific
oversight and administrative obligations concerning AMT's accounting, financial reporting, internal
controls, and Stock Option Plan during the Class Period.

81.     Defendants' Restatement itself supports a strong inference of scienter. The
Restatement, discussed in detail below, concedes that Defendants omitted material facts from AMT's
financial statements for every fiscal year it has been a public company. The Restatement also concedes
the Company lacked adequate internal controls, and indeed that internal controls were largely
nonexistent. This admission in and of itself evidences that AMT's and the Officer Defendants' conduct
throughout the Class Period violated the Company's own written Stock Option Plan and, at the same
time, evidences that the Committee Defendants allowed this conduct to occur, and signed off on the
financial statements issued and stock-option related disclosures made a result thereof, with complete

disregard for GAAP, the Company's Stock Option Plan (the terms of which all Individual Defendants were undeniably aware of), and the Company's lack of adequate internal controls. This admission, moreover, establishes that options backdating and other abusive practices were carried out virtually as a matter of company policy.

## B.   Officer Defendants

82.   The Officer Defendants were consciously aware that AMT's accounting practices with respect to stock option compensation violated GAAP, whose provisions (discussed below) relating to accounting for stock-based compensation, principally Accounting Principles Board Opinion ("APB") No. 25, were straightforward and easy to grasp. As further alleged below, the Notes to the Consolidated Financial Statements in AMT's Form 10-K Annual Reports for 2001 through 2005, each of which annexed the Stock Option Plan as an exhibit, clearly explain that GAAP provides that stock option compensation expense is the difference, as of the grant date, between the fair market value of the Company's stock and the exercise price. These Form 10-Ks also explain that it was Company policy to award incentive stock options with an exercise price not less than the market price on the grant date, and that exercise prices for non-qualified stock options were set at the Board's discretion but to date were not less than the market price on the grant date. Defendant Singer signed all of the 2001-2005 Form 10-Ks. Defendants Dodge and Benincasa signed the 2001 and 2002 Form 10-Ks. Defendant Taiclet signed the 2003, 2004 and 2005 Form 10-Ks. Defendant Allen signed the 2003 and 2004 Form 10-Ks. Defendant Bua signed the 2005 Form 10-K.

83.   Additionally, as further alleged below, the Notes to the Consolidated Financial Statements in the 2001 Form 10-K, which was signed by Defendants Dodge, Singer, and Benincasa, state than in accordance with Company policy and GAAP, "there is no compensation cost related to option grants reflected in the accompanying consolidated financial statements." The Notes in the 2002 Form 10-K, which was signed by Defendants Dodge, Singer, and Benincasa, similarly state that the

Company had not issued any stock options to date that would result in compensation expense and, "[a]ccordingly, there is no recognition of compensation expense related to option grants reflected in the accompanying consolidated financial statements."

84. The findings of the Special Committee support a strong inference of scienter. In conducting its internal investigation, which included a review of substantially all stock options AMT had ever granted, AMT and the Special Committee obtained extensive, in-depth information about the Company's accounting practices with respect to the granting of stock options. According to the Special Committee, whose findings were accepted by the Board of Directors, that "most" stock option grants from June 1998, when AMT became a public company, into 2005 were intentionally and improperly backdated or otherwise manipulated. The findings also indicate that the manipulated stock options were granted by management pursuant to authority delegated by the Compensation Committee.

85. From June 1998, when AMT became a public company, through 2004, for large annual option grants and many individual grants, management *"followed a practice of choosing past dates as grant dates so as to use a lower exercise price, with the period of lookback appearing to range from a couple of days to eight weeks."* Moreover, past management *"frequently looked back to select option grant dates."* Thus, AMT has admitted that the options backdating activity was intentional and knowing, or at a minimum highly reckless, and in violation of the Company's Stock Option Plan.

86. According to the Special Committee, at least one member of past management *"likely"* was actually aware that by backdating options through the improper use of lookbacks, the Company was issuing financial statements that violated GAAP and were thus false and misleading, and that the Company's public disclosures concerning stock option grants were false.

87. Further, members of past management who were involved with the Company's "flawed" stock option practices *"should have been aware"* of the accounting and legal ramifications of such practices and should have sought accounting and legal advice as to these practices. With respect to current

management, the Special Committee similarly found that members of management who initiated or were involved with the option backdating practices *"should have been aware"* of the accounting and legal ramifications or inquired further. These findings establish, at a minimum, highly reckless conduct.

88.     The certifications made by Defendants Dodge, Taiclet, and Singer during the Class Period pursuant to the Sarbanes-Oxley Act of 2002, as detailed below, also support a strong inference of scienter. These Defendants certified in AMT's annual and quarterly reports that they had designed sufficient disclosure controls and procedures to ensure that material information concerning the Company was made known to them. Dodge, in AMT's 3Q02 10-Q, 2002 10-K, 1Q03 10-Q, and 2Q03 10Q; Singer, in the 3Q02 10-Q and 1Q03 10-Q and every quarterly and annual report thereafter; and Taiclet, in the 3Q03 10-Q and every quarterly and annual report thereafter, each certified that he "designed such disclosure controls and procedures . . . to ensure that material information relating to [AMT] . . . is made known to us . . . particularly during the period in which this . . . report is being prepared . . . ."

89.     The fact that AMT was engaging in improper stock options manipulation was "material information," the disclosure of which would have affected (and did affect) the fair presentation of AMT's financial statements in compliance with GAAP and which was contrary to AMT's disclosures in its quarterly and annual reports concerning its stock option policies. The certifications constitute admissions that Dodge, Taiclet and Singer knew or, at a minimum, were highly reckless in not knowing, that AMT was engaging in improper stock options backdating and its associated impact on AMT's financial statements.

90.     Additionally, several of the Officer Defendants used the options manipulation scheme to enrich themselves by millions of dollars in insider trading proceeds during the Class Period. Defendants Taiclet, Singer, and Allen personally benefited from the following sales of directly owned AMT common stock, all made through the exercise of manipulated stock options. The profits from these transactions

further evidences these Defendants' knowledge of and participation in AMT's stock option manipulation scheme:

| Defendant | Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| James D. Taiclet, Jr. | 03/13/06 | 100 | $30.67 | $3,067.00 |
| | 03/13/06 | 100 | $30.69 | $3,069.00 |
| | 03/13/06 | 300 | $30.60 | $9,180.00 |
| | 03/13/06 | 7,500 | $30.55 | $229,125.00 |
| | 03/13/06 | 1,300 | $30.52 | $39,676.00 |
| | 03/13/06 | 5,400 | $30.51 | $164,754.00 |
| | 03/13/06 | 700 | $30.53 | $21,371.00 |
| | 03/13/06 | 22,100 | $30.50 | $674,050.00 |
| | 12/12/05 | 2,398 | $27.56 | $66,088.88 |
| | 12/12/05 | 2,600 | $27.55 | $71,630.00 |
| | 12/12/05 | 400 | $27.51 | $11,004.00 |
| | 12/12/05 | 19,400 | $27.50 | $533,500.00 |
| | 12/12/05 | 200 | $27.62 | $5,524.00 |
| | 12/12/05 | 2,800 | $27.47 | $76,916.00 |
| | 12/12/05 | 19,300 | $27.40 | $528,820.00 |
| | 12/12/05 | 700 | $27.42 | $19,194.00 |
| | 12/12/05 | 27,200 | $27.45 | $746,640.00 |
| | 11/11/05 | 5,000 | $26.10 | $130,500.00 |
| | 11/11/05 | 10,000 | $26.00 | $260,000.00 |
| | 11/11/05 | 1,000 | $25.98 | $25,980.00 |
| | 11/11/05 | 9,000 | $25.95 | $233,550.00 |
| | 12/10/04 | 87,500 | $17.25 | $1,509,375.00 |
| | 12/10/04 | 62,500 | $17.25 | $1,078,125.00 |
| Total | | 287,498 | | $6,441,138.88 |
| | | | | |
| Bradley E. Singer | 03/10/06 | 400 | $30.05 | $12,020.00 |
| | 03/10/06 | 5,000 | $30.00 | $150,000.00 |
| | 03/10/06 | 1,400 | $29.96 | $41,944.00 |
| | 03/10/06 | 9,400 | $29.90 | $281,060.00 |
| | 03/10/06 | 100 | $29.92 | $2,992.00 |
| | 03/10/06 | 500 | $29.93 | $14,965.00 |
| | 03/10/06 | 13,200 | $29.95 | $395,340.00 |
| | 11/15/05 | 48,700 | $25.80 | $1,256,460.00 |
| | 11/15/05 | 1,400 | $25.81 | $36,134.00 |
| | 11/15/05 | 3,200 | $25.83 | $82,656.00 |

| | | | | |
|---|---|---|---|---|
| | 11/15/05 | 17,800 | $25.85 | $460,130.00 |
| | 11/15/05 | 1,397 | $25.88 | $36,154.36 |
| | 11/15/05 | 21,400 | $26.00 | $556,400.00 |
| | 11/15/05 | 300 | $26.04 | $7,812.00 |
| | 11/15/05 | 4,300 | $26.12 | $112,316.00 |
| | 11/15/05 | 2,500 | $26.14 | $65,350.00 |
| | 11/15/05 | 15,000 | $26.15 | $392,250.00 |
| | 11/15/05 | 11,000 | $26.17 | $287,870.00 |
| | 11/15/05 | 500 | $26.18 | $13,090.00 |
| | 12/07/04 | 15,000 | $18.45 | $276,750.00 |
| | 12/07/04 | 77,497 | $18.45 | $1,429,819.65 |
| | 03/04/04 | 15,000 | $11.73 | $175,950.00 |
| | 03/04/04 | 22,503 | $12.00 | $270,036.00 |
| | 03/04/04 | 62,497 | $11.73 | $733,089.81 |
| Total | | 349,994 | | $7,090,588.82 |
| | | | | |
| Timothy F. Allen | 03/02/04 | 11,900 | $11.30 | $134,470.00 |
| | 03/01/04 | 7,017 | $11.30 | $79,292.10 |
| Total | | 18,917 | | $213,762.10 |

## C.    Committee Defendants

91.    The Committee Defendants, each of whom served *simultaneously* on *both* the Audit and Compensation Committees of AMT's Board of Directors during the Class Period, acted with a high degree of recklessness in the performance of their duties and, as a direct result, facilitated the accounting fraud and utter lack of internal controls at AMT described herein.

92.    The vital importance of an independent and properly functioning audit committee to the integrity of a company's financial reporting cannot be overstated.   AMT's 2005 Proxy Statement described the important rules and responsibilities of its Audit Committee:

> Our Audit Committee oversees management's conduct of our financial reporting processes and meets privately, outside the presence of management, with our independent registered public accounting firm to discuss our internal accounting controls and policies and procedures. This includes the selection and evaluation of our independent registered public accounting firm, *the oversight of our systems of internal accounting and financial controls, the review of the annual independent audit of our financial statements, the review of our financial disclosures,* the

review of the Company's Code of Conduct, the establishment of "whistle-blowing" procedures, and the oversight of other compliance matters. [Emphasis added.]

93.     An independent and properly functioning compensation committee is similarly essential to ensuring that matters of executive compensation, including the granting of stock-based incentive compensation, are administered reasonably and consistent with the Company's policies, disclosures and applicable GAAP. AMT's 2005 Proxy Statement also described the important rules and responsibilities of the Compensation Committee:

> The primary responsibilities of the Compensation Committee are to assist the Board in establishing compensation policies for the Board and the Company's executive officers, including approval of any employment agreements or arrangements with executive officers, and to review and approve corporate goals and objectives relative to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and determine the CEO's compensation level based on this evaluation. *This committee also is responsible for administering the Company's stock option plans and approving any proposed amendments or modifications to our Amended and Restated 1997 Stock Option Plan (the "Stock Option Plan").* [Emphasis added.]

94.     Among the Board's standing committees, the Audit Committee and Compensation Committee had direct and specific responsibility for the proper administration of the Stock Option Plan and the oversight of AMT's accounting for and disclosure of stock option grants and the presence of internal processes, controls and procedures regarding those grants. It was fundamental that the Committee Defendants, each of whom sat on both the Audit and Compensation Committees, have a detailed understanding of the Company and particularly the adequacy of its financial systems and internal controls and the terms and properly administration of the Stock Option Plan.

95.     AMT's Stock Option Plan specifically charged the Compensation Committee with the responsibility of carrying out and administering the Stock Option Plan according to its terms and in compliance with the federal securities laws. As evidenced by AMT's own Restatement, the Committee Defendants entirely failed in this task.

96.     In this regard, the Committee Defendants were consciously aware, or were highly reckless in not knowing, that AMT improperly accounted for and disclosed stock option grants. Moreover, the Committee Defendants were consciously aware, or were highly reckless in disregarding, that the Company's financial systems and internal controls were grossly inadequate.

97.     The Committee Defendants acted recklessly in allowing AMT to make the false and misleading statements identified below without ensuring that the necessary internal controls existed to guarantee that those statements were free from material error. The Committee Defendants had the stated responsibility to discuss those controls with AMT's management and the Company's outside auditors.

98.     As discussed below, the Special Committee expressly found, and AMT admitted in the Restatement, that the Company's internal processes, procedures and controls regarding stock option grants were flawed throughout the Class Period. AMT admitted further that these controls were so fundamentally flawed that the Company's financial statements could not be relied upon for the entire Class Period and these flaws were not remedied until the end of fiscal year 2005.

99.     The Company's own Restatement and the findings of the Special Committee, which were accepted by the Board and included in the Restatement, establish that AMT's internal controls and processes for the accounting for, and disclosure of, stock option grants were entirely inadequate. The fact that the Company has made these concessions that these internal controls were inadequate conclusively establishes the Committee Defendants' scienter. The Committee Defendants, all of whom were members of the Audit Committee, were charged with knowing these controls, making sure they were appropriate, and remedying any related problems. Had the Committee Defendants conducted any investigation of those controls, or engaged in any substantive discussion of the adequacy of those controls with management or AMT's outside auditor, they would have necessarily discovered the inadequacy of those controls and implemented controls sufficient to have prevented the misconduct

alleged herein. The fact that the Committee Defendants either were aware of these failures and chose to ignore them, or simply failed to conduct the necessary, and required, investigation, evidences their knowledge or highly reckless disregard of the wrongdoing at AMT.

100.   The Committee Defendants were aware that AMT's accounting practices with respect to stock option compensation violated GAAP, whose provisions relating to accounting for stock-based compensation, including APB No. 25, were relatively straightforward and easy to grasp. As further alleged below, the Notes to the Consolidated Financial Statements in AMT's Form 10-Ks for 2001 through 2005, each of which annexed the Stock Option Plan as an exhibit, clearly explain that GAAP provides that stock option compensation expense is the difference, as of the grant date, between the fair market value of the Company's stock and the exercise price. These Form 10-Ks also explain that it was Company policy to award incentive stock options with an exercise price not less than the market price on the grant date, and that exercise prices for non-qualified stock options were set at the Board's discretion but to date were not less than the market price on the grant date. Defendant Reeve signed all of the 2001-2005 Form 10-Ks. Defendant Katz signed the 2003, 2004 and 2005 Form 10-Ks. Defendant Wilderotter signed the 2001, 2002 and 2003 Form 10-Ks.

101.   Additionally, as further alleged below, the Notes to the Consolidated Financial Statements in the 2001 Form 10-K, which was signed by Defendants Reeve and Wilderotter, stated than in accordance with Company policy and GAAP, "there is no compensation cost related to option grants reflected in the accompanying consolidated financial statements." The Notes in the 2002 Form 10-K, which was signed by Defendants Reeve and Wilderotter, similarly stated that the Company had not issued any stock options to date that would result in compensation expense and, "[a]ccordingly, there is no recognition of compensation expense related to option grants reflected in the accompanying consolidated financial statements."

102.    The findings of the Special Committee indicate that the backdated stock options were granted by management pursuant to authority delegated by the Compensation Committee. The Special Committee found, however, that the Compensation Committee failed to adequately document its delegation of stock option granting authority. The result of this was that the necessary legal approval of grants did not occur until they were subsequently approved by the Compensation Committee, and the grants dates recorded for accounting purposes were legally wrong.

103.    The Special Committee explained that the process by which the Compensation Committee formally approved option grants involved the signing of unanimous written consents that included schedules of option grants approved by management for the preceding quarter, and that the Compensation Committee typically used the date set forth in the schedules as the option grant date. However, these option grant dates, which were recorded by the Company for accounting purposes, were often wrong and not the legal grant date because the unanimous written consents were not signed by all of the Compensation Committee members until later, and sometimes "many months" later.

104.    These findings establish that the Committee Defendants, all of whom served on the Audit and Compensation Committees during the Class Period, were, at a minimum, derelict in their duty with a high degree of recklessness.

### D.      Confidential Witness Allegations

105.    Lead Plaintiff has obtained relevant information from several former AMT employees who have come forward on a confidential basis. Their averments support a strong inference of scienter.

106.    Confidential Witness ("CW") No. 1:    CW No. 1 was AMT's Stock Plan Administrator and also served as a Benefits Administrator between April 2003 and March 2005, working at the Company's Boston headquarters in the Human Resources and Information Systems Department. CW No. 1's daily responsibilities as Stock Plan Administrator included entering, printing, and monitoring "daily reports" relating to stock options, using Equity Edge, an electronic tracking system maintained at

43

the Company. According to CW No. 1, every time stock options were "papered" at AMT, they were dated a little bit in the past. "Papering" essentially constituted sending out a letter concerning options to an AMT employee and entering amounts and dates into the Equity Edge computer program. A little bit in the past could mean a month or a couple of months according to CW No. 1.

107.    CW No. 1 reported to Suzanne Walsh, Benefits Administrator, who reported to Brenna Jones ("Jones"), Human Resources Director. Jones, in turn, reported to Aileen Torrance ("Torrance"), Senior Vice President of Human Resources and head of the department. According to CW No. 1, Torrance directed CW No. 1 as to what measurement dates to use for option grants. On the rare occasions when Torrance was not in the office, Jones directed CW No. 1 as to what grant date to use.

108.    According to CW No. 1, the process of papering options at AMT was always done in a frenzy. CW No. 1 would ask Torrance what dates to use and would get no immediate response until Torrance would suddenly give CW No. 1 the grant dates and give CW No. 1 very little time to "paper" the entire Company's stock options.

109.    According to CW No. 1, Torrance reported to Taiclet, the CEO, and took all of her orders directly from him. All stock option grants at AMT required final approval from Taiclet or Singer, the CFO. Torrance and Taiclet were in constant communication. In fact, according to CW No. 1, Torrance's office was not located within the Human Resources Department but, unusually, was in the "Executive Circle" together with Taiclet, Singer, and other top Company executives.

110.    <u>CW No. 2:</u>    CW No. 2 was a Vice President for AMT's Central Region, working in the Company's Schaumburg, Illinois office from October 1998 through the end of 2003. CW No. 2 received 300 stock options when first hired by AMT, and received stock options annually thereafter based on performance. Options tended to vest over three or four years, usually four years. According to CW No. 2, all AMT employees received some number of stock options, and the decisions to grant stock options were made at the "Senior Executive Team" level, which CW No. 2 defined as the CEO,

CFO and Controller. When CW No. 2 first joined AMT, the members of the Senior Executive Team were Dodge, CEO, Joseph Winn, CFO, and Benincasa, Controller. Dodge signed letters granting stock options. CW No. 2 recalled attending a meeting with two persons who directly reported to Steve Moskowitz (AMT's Executive Vice President for the U.S. Tower Division, who reported to the CEO) at which it was said that the strike price for employee stock options was determined by taking a two week window around the employee's date of hire and picking the lowest stock price that gave the most favorable treatment to the employee.

111.     CW No. 3:     CW No. 3 was a Payroll Manager in AMT's Human Resource and Information Systems Department in the Boston headquarters from August 2002 to May 2005. CW No. 3 reported to Torrance. According to CW No. 3, AMT granted 200 or 300 stock options to all new hires and awarded options annually based on performance. All information to be recorded as employee compensation expenses was given to the Human Resources Department by the "Executive Team," which included Taiclet, Singer, Torrance, J. Michael Gearon, Jr. (the Company's Vice Chairman and President of American Tower International, Inc., its international operating subsidiary), Hal Hess, AMT's General Counsel, and Steve Moskowitz.

112.     CW No. 4:     CW No. 4 was a Vice President for Sales at AMT's Verestar subsidiary between 1999 and May 2004. CW No. 4, received stock options while employed at AMT, and stated that all employees above a certain level received stock options as incentive compensation and that certain employees received options for promotions as part of an annual bonus plan. CW No. 4 stated that there was a very clear process for how the price was set for stock options: they chose the stock's lowest price of the month.

113.     CW No. 5:     CW No. 5 was Co-President, then President, of AMT's Construction Services Group, working in Ulif, Texas and New Mexico, from 1998 through 2002. CW No. 5 initially reported to Doug Wiest ("Wiest"), the Chief Operating Officer, and received stock options on Wiest's

recommendation. CW No. 5 negotiated with Wiest for CW No. 5's option grants as well as for employees working under CW No. 5. According to CW No. 5, stock options were given to employees during performance evaluations as incentives to keep them on board at the Company. When AMT acquired companies, AMT would use stock options to convince employees not to leave AMT and work for a competitor. CW No. 5 believes Wiest consulted with Dodge (to whom Weist reported) as to these stock option grants before they were approved. Wiest told CW No. 5 that the stock options "price was set from the stock's lowest price during the quarter at a given time." CW No. 5 believes Dodge made the decision to price stock options in this manner.

114.   <u>CW No. 6:</u>   CW No. 6 was, together with Dodge, one of the four founding members of AMT. CW No. 5 worked for AMT and its predecessors in a variety of positions, the last of which was Vice President of Product Development (Broadcast Development), between February 1996 and August 2002. CW No. 6 worked in the Company's Boston headquarters.

115.   According to CW No. 6, Benincasa was among the AMT executives directly involved in stock option grants. CW No. 6 recalls that the grant dates of some of the stock options CW No. 6 received were earlier than the dates on which the options were actually received.

116.   According to CW No. 6, AMT management was always pushing the envelope, and the culture of the Company was such that if the SEC or DOJ wasn't breathing down their neck, then they were not pushing things far enough. CW No. 6 believes the Company was always doing things that would get them in trouble with the SEC.

117.   According to CW No. 6, Dodge always wanted to keep his hands clean of problems with the SEC or DOJ but that Dodge had henchmen in his inner circle, which he called his "bulldogs," to do his "dirty work." Dodge told CW No. 6: "I pay them to be my bulldogs."

E.     **AMT's Lack of Internal Controls**

118.    The Company's total lack of adequate internal controls during the Class Period also

supports a strong inference of scienter. AMT admitted in the Restatement that it did not maintain an

effective internal control environment based on criteria established by the Committee of Sponsoring

Organizations of the Treadway Commission ("COSO"). Specifically, AMT failed to maintain internal

controls appropriate for the granting of stock options to non-executive employees. The Company

admitted that this resulted in certain stock option grants not being accounted for properly and

contributed to the Company's need to restate its previously reported financial statements.

119.    The Restatement described AMT's weak internal control environment for the granting

of at least certain stock options:

*Management's Annual Report on Internal Control over Financial Reporting (as revised)*

Our management, with the participation of our principal executive officer [Taiclet] and
principal financial officer [Singer], is responsible for establishing and maintaining adequate
internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under
the Exchange Act. Our internal control system is designed to provide reasonable
assurance to our management and Board of Directors regarding the preparation and fair
presentation of published financial statements. Our management assessed the
effectiveness of our internal control over financial reporting as of December 31, 2005,
based on the criteria set forth by the Committee of Sponsoring Organizations of the
Treadway Commission in *Internal Control—Integrated Framework*.

In connection with the filing of the original Form 10-K in March 2006, our management
included Management's Annual Report on Internal Control over Financial Reporting
therein, which expressed a conclusion by management that management believed that the
Company's internal control over financial reporting was effective as of December 31,
2005. As a result of the restatement of our consolidated financial statements, ***our
management has determined that material weaknesses in internal control over
financial reporting existed as of December 31, 2005, and, based on the criteria
noted above, now concludes that our internal control over financial reporting was
not effective as of December 31, 2005.***

Public Company Accounting Oversight Board Auditing Standard No. 2 defines a material
weakness as a significant deficiency, or combination of significant deficiencies, that results
in there being a more than remote likelihood that a material misstatement of the annual or
interim financial statements will not be prevented or detected. Based upon this definition,
our management concluded that, as of December 31, 2005, material weaknesses existed in
our internal control over financial reporting in the following areas:

- ***We had not designed and implemented appropriate controls related to the granting of stock options to our non-executive employees as of December 31, 2005, which resulted in the use of incorrect accounting measurement dates for certain stock option grants and contributed to the restatement reflected in this Form 10-K/A.*** Our management disclosed this to the Audit Committee and to our independent registered public accountants.

- We had not designed and implemented appropriate controls related to accounting for deferred taxes, specifically controls relating to the tax effects of foreign currency fluctuations on intercompany loans with one of our foreign subsidiaries as of December 31, 2005.   Our management disclosed this to the Audit Committee and to our independent registered public accountants.   [Emphases added.]

120.   In Management's Report on Internal Control Over Financial Reporting included in AMT's original Form 10-K Annual Report for 2005, AMT's management, including Defendants Taiclet, Singer and Bua, falsely represented that the Company maintained effective internal controls over financial reporting, consistent with COSO, as of December 31, 2005. The Company's management has subsequently admitted that material weaknesses in internal controls in fact existed as of December 31, 2005. Therefore, the Company has admitted that it misrepresented that it maintained effective internal controls over financial reporting as of December 31, 2005, and Taiclet, Singer, and Bua's representations were false when made.

121.   The Special Committee also found that the Board of Directors (which includes the Audit Committee) and the Compensation Committee "failed" to adopt adequate procedures to ensure that Compensation Committee members understood the Stock Option Plan and that it was properly administered. This is tantamount to an admission by the Company that the Committee Defendants knowingly or, at a minimum, highly recklessly, disregarded their responsibility to properly administer the Company's Stock Option Plan.

122.   Additionally, the Special Committee expressly found that AMT's internal controls were "inadequate" *from 1998 through 2005,* and not only as of December 31, 2005. This total failure throughout the Class Period to maintain effective internal controls regarding stock option grant

practices demonstrates a conscious awareness or a high degree of recklessness on the part of both the

Officer Defendants and Committee Defendants.

## VII.    AMT'S RESTATEMENT OF PREVIOUSLY
REPORTED FINANCIAL STATEMENTS

123.    On November 29, 2006, AMT filed a Form 10-K/A Amended Annual Report

(Amendment No. 1) with the SEC for the fiscal year ended December 31, 2005.  This Form 10-K/A

was signed by Defendants Taiclet, Singer, Bua, Katz, and Reeve.  As described by the Company, the

amended Form 10-K was filed to restate AMT's previously issued financial statements to correct certain

errors related to (i) stock-based compensation not previously recorded for certain stock option grants,

including the related payroll and income tax effects, (ii) additional charges for stock-based compensation

expense related to the modification and repricing of certain stock option grants, primarily associated

with options awarded to two former executive officers of the Company, and (iii) changes to income

taxes related to the tax effects of foreign currency fluctuations on an intercompany loan with a foreign

subsidiary of the Company.

124.    As summarized below, the Form 10-K/A restated the Company's consolidated financial

statements as of December 31, 2004 and 2005 and for each of the years ended December 31, 2003, 2004

and 2005, and restated selected financial data as of and for each of the years ended December 31, 1998

through 2005:

Year Ended December 31 (in thousands, except per share data)

| | 2005 | | | 2004 | | |
|---|---|---|---|---|---|---|
| | Reported | Adj. | Restated | Reported | Adj. | Restated |
| Revenues | $944,786 | | $944,786 | $706,660 | | $706,660 |
| Expenses | 801,592 | $8,080 | 809,672 | 636,906 | $10,975 | 647,881 |
| (Net Loss) | (171,590) | (9,769) | (181,359) | (247,587) | (7,877) | (255,464) |
| Per share | (0.57) | (0.03) | (0.60) | (1.10) | (0.04) | (1.14) |

| | 2003 | | | 2002 | | |
|---|---|---|---|---|---|---|
| | Reported | Adj. | Restated | Reported | Adj. | Restated |
| Revenues | $632,493 | | $632,493 | $577,794 | | $577,794 |
| Expenses | 635,110 | $10,251 | 645,361 | 731,281 | $7,309 | 738,590 |
| (Net Loss) | (325,321) | (3,638) | (328,959) | (1,163,540) | 3,454 | (1,160,086) |
| Per share | (1.56) | (0.02) | (1.58) | (1.77)[1] | 0.02 | (1.75) |

| | 2001 | | | 2000 | | |
|---|---|---|---|---|---|---|
| | Reported | Adj. | Restated | Reported | Adj. | Restated |
| Revenues | $516,114 | | $516,114 | $310,712 | | $310,712 |
| Expenses | 759,234 | $13,603 | 772,837 | 458,225 | $13,318 | 471,543 |
| (Net Loss) | (472,037) | (15,164) | (487,201) | (210,536) | (13,374) | (223,910) |
| Per share | (2.18) | (0.05) | (2.23) | (1.25) | (0.08) | (1.33) |

| | 1999 | | | 1998 | | |
|---|---|---|---|---|---|---|
| | Reported | Adj. | Restated | Reported | Adj. | Restated |
| Revenues | $151,303 | | $151,303 | $83,820 | | $83,820 |
| Expenses | 223,026 | $3,578 | 226,604 | 124,234 | $1,234 | 125,468 |
| (Net Loss) | (64,016) | (3,035) | (67,051) | (53,506) | (1,008) | (54,514) |
| Per share | (0.43) | (0.02) | (0.45) | (0.67) | (0.01) | (0.68) |

125.    On November 29, 2006, AMT also filed a Form 10-Q/A Amended Quarterly Report with the SEC for the first quarter of 2006, ended March 31, 2006. As summarized below, the Form 10-Q/A restated the Company's consolidated financial statements as of March 31, 2006 among other periods:

---

[1] Consistent with AMT's Restatement as presented in the Form 10-K/A, the net loss per-share figure used for the years 2001 and 2002 is the basic and diluted loss per common share from continuing operations before cumulative effect of change in accounting principle. For the years 1998, 1999, 2000, 2003, 2004 and 2005, the figure used is the "bottom-line" net loss per share.

Quarter Ended March 31, 2006 (in thousands, except per share data)

| | 1Q06 | | |
| --- | --- | --- | --- |
| | Reported | Adj. | Restated |
| Revenues | $320,409 | | $320,409 |
| Expenses | 251,362 | $1,338 | 252,700 |
| (Net Loss) | (2,585) | 648 | (1,937) |
| Per share | (0.01) | | (0.01) |

126.    On February 23, 2007, AMT filed a Form 10-K/A Amended Annual Report (Amendment No. 2) with the SEC for the fiscal year ended December 31, 2005. AMT filed this further amended Form 10-K to provide additional disclosure regarding the impact of the Restatement on the Company's originally reported financial statements, including quarterly financial information for each quarter of the years ended December 31, 2005 and 2004.

127.    Thus, AMT admitted in the Restatement that its net income for 1998 through 2005 and the first quarter of 2006 had previously been overstated, and its net loss had previously been understated, by approximately $49.7 million.

128.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

129.    AMT's Restatement constitutes an admission that the financial statements originally issued were false and misleading and that the misstatements of revenues, income and expenses were material. Pursuant to GAAP, as set forth in APB No. 20, the type of restatement announced by AMT was to correct for material errors in its previously issued financial statements. See APB No. 20, ¶¶ 7-13.

(APB 20 was superseded by SFAS 154 in 2005.)  The restatement of past financial statements is generally disfavored as it dilutes confidence by investors in the financial statements and makes it difficult to compare periodic financial statements.  APB No. 20, ¶ 14; FAS 154.  Moreover, immaterial corrections are not required to be restated.  APB No. 20, ¶ 38.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.,* when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements.

130.    AMT's Restatement is not due to a change in reporting entity or a change in accounting principle, but rather to correct intentionally false reporting in previously issued financial statements.  The Restatement constitutes an admission by AMT that its previously issued financial results and its public statements regarding those results were materially false and misleading.

131.    The Company increased (decreased) previously reported net losses by an aggregate amount of $9.77 million, $7.88 million, $3.64 million, and ($3.45) million for the years ended December 31, 2005, 2004, 2003 and 2002, respectively.  The Restatement adjustments increased (reduced) previously reported net losses per common share by $0.03, $0.04, $0.02, and ($0.02) for the years ended December 31, 2005, 2004, 2003 and 2002, respectively.

A.      **Increases to Stock-Based Compensation Expense**
        **Owing to Revised Accounting Measurement Dates**

132.    Because of the following accounting improprieties, AMT presented its financial results and statements in a manner which was not in conformity with GAAP and caused the Company to restate its financial statements.

133.    In effect through December 31, 2005, APB No. 25, "Accounting for Stock Issued to Employees," required a company to recognize compensation expense for options granted where the market price of the stock exceeds the option's exercise price on the date of grant.  Where options are issued at an exercise price equal to market price, no compensation expense should be recorded.  Total

compensation is equal to the total number of options granted multiplied by the difference between the exercise price and market price of the stock on the date of grant. The intrinsic value or total compensation is then recognized as an expense "over the period the employee performs related services." This means that the intrinsic value is amortized as compensation expense over the option's vesting period. This expense is obviously zero for option grants where the exercise price equals the prevailing market price.

134.    A failure to properly account for "in the money" options in accordance with APB No. 25 will result in misstatements in a corporation's financial statements. Options priced below a stock's fair market value when they are awarded result in the executive's receiving an instant "paper gain." Under APB No. 25, that paper gain is the equivalent of additional compensation to the executive that must be treated as a cost to the corporation. A company that fails to record and amortize the intrinsic value of in the money options understates compensation expense and overstates net income on its income statement each year during the vesting period of an option. For example, if a company issues in the money options that vest over five years with an intrinsic value of $25,000,000, the company should recognize compensation expense of $5,000,000 in its financial statements in years 1 through 5. A company that fails to record the $5,000,000 in compensation expense in years 1 through 5 will understate compensation expense and overstate net income. This means that if the company granted "in the money" options on January 1, 2000 that vested over five years and failed to comply with APB No. 25, the company's 2000, 2001, 2002, 2003, and 2004 financial statements, and specifically its income statements, would be materially misstated. Further, a company's SEC filings, such as a Form 10-K or Form 10-Q, containing those financial statements that departed from APB No. 25 will be materially false and misleading.

135.    According to AMT's November 8, 2006 press release announcing the findings of the Special Committee, which were also set forth in the Restatement, the misdated stock option grants fell

into two categories: (1) "lookback" grants, where from June 1998 through 2004, management followed a practice of choosing past dates as grant dates so as to use a lower exercise price; and (2) option grants where there was a failure to complete the legal grant process (e.g., signing of unanimous written consents, listing all option grants approved by management for the preceding quarter, by all members of the Compensation Committee) by the date of the grant, but the options were treated nonetheless as having been granted on that date.

136.    The SEC has adopted the view that failure to properly account for backdated stock options violates the Exchange Act when companies fail to record as compensation expense the amount by which the option grants were actually "in the money" at the time that the grant was awarded.  For example, in a complaint filed by the SEC against Peregrine Systems, Inc. in June 2003, the SEC alleged that Peregrine's option plan administrator used a "look back" process between quarterly Board meetings to identify the day with the lowest stock price over the interval and then declared this date to be the grant date.  The SEC viewed this as a form of financial fraud because it resulted in the understatement of compensation expenses.  Specifically, the SEC stated that, "[u]nder the applicable accounting rules, any positive difference in the stock price between the exercise price and that on the measurement date . . . had to be accounted for as compensation expense.  By failing to record the compensation expense, Peregrine understated its expenses by approximately $90 million."

137.    As disclosed in AMT's November 8, 2006 press release, and as noted in the Restatement, the Special Committee determined that for certain stock option grants, the legal grant dates when all necessary corporate action had been taken differ from the dates previously recorded by the Company for financial accounting and tax purposes.  In issuing the Restatement, AMT determined that it should use the legal grant date, as determined by the Special Committee, as the accounting measurement date for such awards.  Based on this conclusion, the Company applied new measurement dates to the affected stock option grants and, as a result, determined that charges for stock-based compensation

expense and related payroll and income tax effects were required in instances where the quoted market price of the underlying stock at the new measurement date exceeded the employee's exercise price, in accordance with APB No. 25. As a result of these changes in accounting measurement dates, the Company recorded additional stock-based compensation. In the Restatement, for the years ended December 31, 2005, 2004, and 2003, the Company adjusted stock-based compensation related to revised accounting measurement dates (including related payroll tax effects), net of tax, of $4,505,000; $4,877,000; and $10,192,000, respectively.

### B. Increases to Stock-Based Compensation Expense Owing to Modified and Repriced Stock Option Grants

138. AMT also determined in the Restatement that it should have recorded stock-based compensation expense associated with the modification and repricing of certain stock option grants. The expense for the years ended December 31, 2005 and 2004 relates primarily to options awarded to two former executive officers of the Company, as discussed below.

139. In February 2004, the Company granted its former chief financial officer options to purchase 363,333 shares of the Company's Class A common stock, which were granted prior to but in connection with the surrender of options to purchase an aggregate of 495,000 shares of the Company's Class A common stock in December 2004. The Company had originally recorded this as two independent transactions, and it has since determined to account for these transactions as an indirect repricing, resulting in additional stock-based compensation expense of $3.2 million and $2.8 million for the years ended December 31, 2005 and 2004, respectively.

140. In May 2004, the Company signed a separation agreement with its former chief operating officer that provided for the reinstatement of previously terminated options to purchase 240,001 shares of the Company's Class A common stock. The Company has since determined that the agreement constituted an option award to a non-employee with no ongoing service requirements, and accordingly, the Company should have accounted for this transaction as a stock option modification